### SMITH & HEMENWAY CO. v. E. C. STEARNS & CO.

(Circuit Court, N. D. New York. March 30, 1908.)

#### No. 7,127.

PATENTS—INFRINGEMENT—MITER-BOX.

The Seavey patent, No. 622,190, for a saw-guide for sawing material for forming miter-joints, if conceded validity is not in any sense a pioneer patent, but is merely for an improvement in details of construction of the miter-boxes of the prior art, and is limited by the action of the Patent Office to the precise combination shown and described, without any range of equivalents, and the patentee having expressly limited himself to a device with the "two-part slotted standard hinged to the bed outside of the line of the inner face of the bed" the patent is not infringed by the device of the Potter patent, No. 867,927, in which the hinge is located inside of the inner face of the bed, although in all other respects such device is a substantial copy of that of the patent.

In Equity. Suit to restrain alleged infringement of United States letters patent, No. 622,190, issued March 28, 1899, to Thompson and others, as assignee of Charles O. Seavey, for "saw-guide for sawing material for forming miter-joints."

Robinson, Martin & Jones, for complainant.
Alfred Wilkinson, for defendant.

RAY, District Judge. The patent in suit has but one claim, which reads as follows:

"In a saw-guide for sawing material to form miter-joints, the combination of a bed or frame adapted to fit the edge of the material to be sawed, a two-part slotted standard hinged to the bed outside of the line of the inner face of the bed, the parts of said standard being free above the lowest line of movement allowed to the saw and joined together below said line, each part being provided with a laterally-extending plate or frame, said plates being wholly separated from each other throughout, substantially as described."

The patentee says that his "invention has relation to devices for guiding or controlling the position or line of action of a hand saw in sawing up stock in order to fit the abutting ends to form neat close

miter-joints, such as are desirable if not essential in the inside finishing of houses. By my present invention I produce a device which can be applied to the stock to be sawed by merely placing it thereon, and which may be readily adjusted so as to secure an exact cut at any predeterminate angle. My device is, moreover, durable and can be compactly folded, so as to occupy but little room in a carpenter's tool chest or other place where it may be kept." He then says in the specifications, "to the foregoing ends my invention consists of (1) a saw-guide for aiding in cutting stock at any required angle embodying in its construction, a, an angular base or bed adapted to be placed upon the stock to be sawed, and, b, a guide proper for the saw, c, pivoted or hinged upon the end of the bed, d, the said guide being provided at one end with a segmental or curved arm, which, e, extends through a slot in a standard or projection connected with the bed, in which slot the arm is adapted, f, to be clamped so as to hold the saw-guide in fixed position at any angle to which it may be adjusted." This is an old combination of old elements, and produces no new result whatever, and no element performs any new function. It is in fact what is known as a "miter-box." In this claim the patentee says that the bed or frame is adapted to fit the edge of the material to be sawed. One part is turned over at a right angle with the other part so that the one part rests against the face and the other part on the top of the material to be sawed. The next element is a two-part slotted standard and it is hinged to this bed outside of the line of the inner face thereof. These two parts are free above the lowest line of movement allowed to the saw and joined together below said line. By this is meant that the slot between the two parts which receives the saw is open and free down as far as the saw is allowed to operate or is required to operate so that it cuts down through the lumber being sawed without coming in contact with the metal parts or any other obstruction. Each part of this two-part standard is provided with a laterally-extending plate or frame, and these are wholly separated from each other. These plates are side by side and embrace or hold the saw. We have three elements in this claim: (1) "Bed or frame"; (2) "two-part slotted standard"; (3) "laterally-extending plate or frame," one on each part of the standard. Aside from immaterial changes of form, which perhaps make a lighter and even better device, this combination does not differ from the prior art in construction, arrangement, operation, or result except in the single particular that the two-part slotted standard is "hinged to the bed outside of the line of the inner face of the bed."

The file wrapper is in evidence, and shows that the application as originally filed contained five claims, all of which were rejected on references as follows:

"Claim 1 is met in patents: No. 405,210, Goulding, June 11, 1889. No. 108,296, Rossecrans, Oct. 11, 1870. No. 418,177, Goulding, Dec. 31, 1889. No. 548,104, Westfall, Oct. 15, 1895. No. 295,920, Hipolito, April 1, 1884. No. 257,041, Meyers, April 25, 1882. No. 375,187, Nixon, Dec. 20, 1887. (All in mitering saw.) Claims 2 and 4 present nothing of invention over Hipolito, Meyers, and Rossecrans. Claim 3 presents nothing of invention over Hipolito, Meyers, and Goulding. Claim 5 is met in Rossecrans, Meyers, Goulding, and Westfall. The claims are therefore rejected."

Those five claims read as follows:

"1. A saw-guide for sawing material to form miter-joints consisting of an angular bed-plate, a standard hinged to one end of said bed-plate and provided with saw-guide plates extending therefrom, and means for clamping and holding the said guide-plates in any position to which they may be adjusted with reference to the bed-plate.

"2. A saw-guide for sawing material to form miter-joints consisting of a bed-plate adapted to be placed and maintained in position on the material to be operated upon, a standard hinged to one end of said bed-plate and provided with saw-guide plates extending therefrom, as described, a slotted projection on the bed-plate, a segmental arm pivoted at one end to one side of one of the saw-guide plates, its free portion extending through the said slot, and a set-screw for clamping the said segmental arm in position in the said slot.

"3. A saw-guide for sawing material to form miter-joints consisting of a bed-plate, a standard composed of two members clamped together at their lower ends and hinged to said bed-plate, saw-guide plates integrally connected with said members of the standard and extending therefrom, as described, and means for clamping the guide-plates and standard in any position to which they may be adjusted with reference to the bed.

"4. In a saw-guide, the combination, with an angle base or bed provided with a slotted stud or projection and a set-screw, of a slotted standard hinged to the base and having saw-guide plates projecting therefrom, and a graduated segmental arm connected at one end to the side of one of the saw-guide plates and projecting through the slot in said stud or projection of the bed-plate, whereby the saw-guide plates may be adjusted with precision at any desired angle with respect to the bed-plate and clamped in said adjusted position.

"5. In a saw-guide, the combination with a bed adapted to be placed on the stock, and adjustable saw-guide plates adapted to swing over the stock to be sawed, and to be held in any position to which they may be adjusted."

They embrace each and every element of the claim substituted and allowed and now in suit aside from "a two-part slotted standard hinged to the bed outside of the line of the inner face of the bed."

"Bed or frame adapted to fit the edge of the material to be sawed" is found in old claims 2 and 5. "A two-part standard" is found in old claim 3, and a "slotted standard" in old claim 4. The standard is hinged to the bed or frame in the first four old claims. In old claim 3 the two parts of the standard are only fastened together at their lower ends, and hence are free and open down to that point. The saw-guide plates extend from the standards in four of the claims. Reference to the patents cited in the Patent Office shows that Seavey limited himself to the slotted standard hinged to the bed outside of the line of the inner face of the bed in order to get his patent—in order to distinguish his claim from the prior art. The bed or frame of this device, the horizontal part thereof being at right angles with the upright part, may be of wood or metal, and it holds at one end the saw-guide proper, which is hinged or pivoted thereto so as to swing to the right and left. This two-part slotted standard which carries the said laterally extending frame for holding and guiding the saw is pivoted to the bed at one end just below the horizontal part and also lower down, but the lower hinge or pivot serves no purpose except to give strength; that is, hold the standard more truly and rigidly in position. The hinges or pivots are attached to one part of the standard only, and hence if the standard is pivoted to the bed at its right-hand end the other part of the standard is further to the

right than are the hinges or pivots which do not interfere with or obstruct the slot between the two parts of the standard. The two parts of this standard are clamped—fastened together—at their lower ends, and hence from that point there is a free opening upward for the saw blade. The laterally-extending plates or frames extend in the same direction at right angles to the standard over the horizontal part of the bed, one for each part, and fit closer together than the parts of the standard so as to maintain the saw blade in its perpendicular position, each pressing slightly against it but not interfering with its movement. We now have the swinging arms of the saw holder so pivoted as to swing within a limit at any desired angle to the bed, and hence the saw placed in the holder will swing at any desired angle to the piece to be cut or sawed. As these pivots or hinges are below the horizontal part of the bed, it is necessary, in order to have an operative device, to pivot or hinge the two-part slotted standard "outside the line of the inner face of the bed." Otherwise the hinges or pivots would come against the face of the timber to be cut and and no true cut at a desired angle could be made. When the angle of the cut is determined the holding blades are swung to the right or to the left to that angle, which is indicated on a guage or segmental or curved arm extending through a slot in an upward projection of the bed, and which segmental arm may be clamped and held by means of a screw at the desired point. As the two parts of the standard extend lower down than the timber to be sawed, as a rule, although not necessarily so, a pin of wood is inserted in the lower end of the slot for the teeth of the saw to strike upon after cutting through that operated upon. This saw-guide is constructed for small timbers usually, but it could be enlarged and the standards extended downwardly indefinitely but this would serve no useful purpose as the standards are not saw-guides but supports for the saw-guides or laterally extending arms, and one of them is also utilized for the pivoted connection.

The defendant's device is, substantially, a Chinese copy of complainant's, except that one of its laterally extending plates or frames, forming a part of the two-part standard, has a horizontal flange and projection with a socket to receive a vertical pivot pin, forming a part of the bed at one end, and on this pin the saw-guide proper is pivoted to the bed. Defendant's device has but one hinge or pivot, and this is located not outside but inside the inner face of the bed, and as a result the defendant's two-part slotted standard is hinged to the bed inside the line of the inner face of the bed. The purpose, mode of operation, and result attained by the two devices are precisely the same. But each party has a patent for its device. Complainant proceeds under the said Seavey patent; the defendant under a patent to one William M. Potter, assignor to defendant company, dated October 8, 1907, application filed April 27, 1905, No. 867,927, for "miterbox." The claim of that patent reads as follows:

"In a folding miter-box, the combination with the base composed of a face-plate and integral top-plate arranged at a right angle to the face-plate, whereby the base fits a square edge of a round bearing pin on the upper surface of the top-plate near one end and arranged within the plane of the face-plate, a clamping sleeve fitted to said pin and adapted to turn thereon,

means to clamp said sleeve on the pin in fixed position, a downwardly depending inner shank and an inner jaw transversely arranged on the upper end of the shank, said jaw and shank being integral with the sleeve, a corresponding outer shank and jaw, said outer shank being secured to said inner shank at their lower ends, by two screws, and said shanks having correspondingly flaring outer ends and flat, vertically arranged faces arranged parallel and close together, an integral platform on the inner face of the sleeve arranged parallel to the top plate, a segmental plate on said platform having a notched inner edge and indicating numerals on its upper surface, a spring latch on the top plate to engage with said notches, a supporting plate of greater width, thickness, and length than the top-plate arranged parallel thereto on the inner face of the face-plate, means to secure said supporting plate to the inner face of the face-plate at adjustable distances from the top-plate, and a bench clamp secured on said supporting plate, substantially as described and shown."

It is seen that this device, or miter-box, has the "bed or frame" of Seavey, called "the base"; the "two-part slotted standard" of Seavey, called "a downwardly depending inner shank and an inner jaw transversely arranged on the upper end of the shank, * * * a corresponding outer shank and jaw, said outer shank being secured to said inner shank at their lower ends by two screws," etc., and also the "holding arms or plates" of Seavey, which in Potter are called "inner jaw" and "outer jaw," being the jaws aforesaid, the shanks—really the jaws of the shanks—having flat vertically arranged faces, arranged parallel and close together. These jaws hold and guide the saw. Different names are given by the respective patentees to the same thing performing the same office or function in the combinations. Potter has added in the language of the claim a description of some details, old in the art, which Seavey has, but does not mention in his claim, as, for instance, the "segmental arm 1, the free part of which passes through a slot, m, formed in an upper projection, n, from the base, a, and tapped into the upper end of the said projection is a set screw, o, adapted to be turned down on the segmental arm and hold it in any position to which it may be adjusted or moved in the slot, m," etc., is fully described by Seavey in his specifications and shown in his drawings, but is not mentioned in his claim; while Potter in his claim describes that part of his device as follows:

"A segmental plate on said platform having a notched inner edge and indicating numerals on its upper surface, a spring latch on the top-plate to engage with said notches, a supporting plate of greater width, thickness, and length than the top-plate arranged parallel thereto on the inner face of the face-plate," etc.

The "round bearing pin" of Potter's device is a pivot pin fixed and inserted in the end of the horizontal part of his base and is located within the plane of the face-plate. This pin enters the hole in the clamping sleeve, so called, which is a projection on the inner jaw, and transversely arranged on the upper end of the shank. In this way and by this means the shanks and jaws which carry and clamp the saw blade are pivoted to the bed. This clamping sleeve has a thumb screw, means for tightening it on the pivot pin. It is a different mode of pivoting the two members of this miter-box together. But both methods are old and well known. The swinging movement of the part that holds and guides the saw and determines the angle of the cut is precisely the same in both combinations. One member

of the pivots or hinges of the Seavey device is an integral part of the inner part of the two-part standard, while the other is an integral part of the perpendicular face of the bed; while in the Potter patent one member of the pivot or hinge is an integral part of the inner part of his two-part standard, and the other member is an integral part of both the perpendicular and horizontal parts of the bed. In both devices a third member, or pin, is the pivot on which the true saw holder turns. As before stated the only substantial difference in the two devices is the location of the pivot or hinge.

Turning to the prior art, we have the Goulding patent, No. 418,177, dated December 31, 1889, which has a bed or frame adapted to be placed upon the material to be cut with an elevated part at one end having a pivot pin or "round bearing pin," on which the saw-guide proper is pivoted to the bed or frame, said pin being located just inside the line of the inner face of the bed. The saw-guide proper consists of a frame extending upward from the pivot point on which it turns, and by means of a set screw binding against the pivot pin it may be set and held at any desired angle. The saw is inserted at the end or from below, and is held in position at the predeterminate angle while the sawing operation is going on by two two-part slotted standards forming a part of such frame, so constructed that each part presses slightly against the saw on opposite sides thereof, of course. One part has an extension containing the hole or "clamping sleeve" for the pivot or "round bearing pin." The defendant's device (Potter) is a copy of the Seavey and Goulding devices. Goulding does not have the segmental plate with numerals indicating the angle as does Seavey and Potter, but this was old in the art, and is shown in Meyers, No. 257,041, dated April 25, 1882, Rossecrans, No. 108,296, dated October 11, 1870, and Blissfield, No. 81,782, dated Sept. 1, 1868. He has, however, a substitute, as "the lug of the bed plate is provided with angle holes which register with a pin in the hub of the frame." While I fail, in view of the prior art, to find in either device any new element, or any new combination of old elements producing a new or different result or a better result, or a new mode of operation, or an improved mode of operation, and am of the opinion that neither Seavey nor Potter disclose patentable novelty, and that both patents are void, the case may be disposed of on the ground that Seavey was a mere improver, in no sense a pioneer, is limited by the action of the Patent Office to the precise combination shown and described by him, and has expressly limited himself to a device with the "two-part slotted standard hinged to the bed outside of the line of the inner face of the bed," and is not entitled to any range of equivalents. This combination defendant does not make, use, or sell. Therefore he does not infringe. He so differentiates his device in many respects that infringement is not made out. If I could find any conception amounting to patentable invention and means for carrying it into effect in the Seavey patent outside of the mere location of the pivots appropriated by the defendant I should sustain the patent, and hold that infringement is made out. The appropriation by defendant of the Seavey construction is plain and palpable. For lightness and convenience of handling and operation it is an improvement on the prior art, but

ordinary mechanical skill was and is competent to accomplish all that Seavey did and all that Potter does.

The complainant insists that the true reading and construction of the Seavey claim is that the two-part slotted standard is hinged to the bed so as to swing outside of the line of the inner face of such bed, and that the claim does not refer to the location of the hinges or pivots themselves, and that while Potter has located his hinge or pivot inside that line he thereby swings his two-part slotted standard outside the line of the inner face of the bed and has the equivalent of Seavey and the same mode of operation in that regard. If that construction can be given to Seavey's claim—and he discloses patentable invention—then the contention is true, and defendant infringes. But Seavey framed his claim and selected his words. His language is "a two-part slotted standard hinged to the bed outside of the line of the inner face of the bed," not a "two-part slotted standard hinged to the bed" so as to, or in such a manner as to swing or move "outside of the line of the inner face of the bed," nor, a two-part slotted standard outside the line of the inner face of the bed and hinged to said bed! These words which complainant would have read into the claim, in view of what transpired in the Patent Office and of the hinging or pivoting of the saw-guide of the Goulding patent whose standards swing outside the line of the inner face of the bed, are important, and to my mind would materially change the reading of the Seavey claim. The specifications throw little light on this subject, but the drawings show the location of a pivot at K, near the lowest point of the bed and outside the face thereof. The specifications say:

"The standard and connecting saw holding and guiding plates are hinged to the base 'a,' as at 'k,' so that the guide plates may be swung around at any angle with respect to the bed plate as indicated. * * * It will be noticed that the two-part slotted post, to which the laterally-extending plates or guides 'd' are secured, is located outside of the plane of the inner face of the angle plate or bed 'a,' which line coincides with the outer edge of the material to be sawed."

The rejected claims called for this two-part slotted standard or post pivoted or hinged to the post, and it was only when the language was changed to its present form—"hinged to the bed outside of the line of the inner face"—that the claim was allowed. I think the claim must be construed to mean that the standard is actually hinged outside the line of the inner face, and not that it is hinged to swing outside, or hinged in such a manner that the post or standard will hang or be outside. If this be not so then there is no difference between the hinging of Seavey's device and that of Goulding. Goulding was cited against the original claims presented, and we must assume the change of language as to hinging was made intentionally and understandingly. Reverse the saw holder of Goulding, take off one of his standards or move it back to the point of pivoting, elevate the standards slightly, and we have in effect and substance both Seavey and Potter. Especially would this be true if we add the segmental plate of Potter and the segmental arm of Seavey which ordinary mechanical skill is competent to do, and which had been successfully done in the prior art. In short, Seavey and Potter as stated are mere improvers, and they have added no new element in their structures which

performs any new function or modifies or changes the functions or results of the old combinations. They have changed the details of construction. They do just what the prior art did, viz., furnish an angle plate bed, a saw-guide pivoted thereto so it may be swung to any desired angle above the timber to be sawed and held in position during the sawing operation.

In Loom Co. v. Higgins, 105 U. S. 591, 26 L. Ed. 1177, it is laid down that to constitute invention a new combination of old elements must produce a new and a beneficial result, not attained before; that both novelty and utility must characterize the subject of a valid patent, but that "even these are not enough for we must have invention. The new or improved thing must be the product of some exercise of the mental faculties—the result of a mental conception." Pearce v. Mulford, 102 U. S. 112, 26 L. Ed. 93; Atlantic Works v. Brady, 107 U. S. 199, 2 Sup. Ct. 225, 27 L. Ed. 438; Burt v. Evory, 133 U. S. 349, 10 Sup. Ct. 394, 33 L. Ed. 647.

In view of the file wrapper, the prior art, and the wording of the claim the court cannot rewrite the claim or insert words not found therein to make it conform to what we may suppose the patentee intended. Said the Circuit Court of Appeals, Second Circuit, in Universal Brush Co. v. Sonn, 154 Fed. 665, 668, 669, 83 C. C. A. 425:

"We are asked to reconstruct the claim by substituting the word 'face' for the word 'contracted' and adding to the claim the following: 'Said face aperture being sufficiently narrow or contracted to retain said composition.' Whether such a claim, if originally inserted in a patent describing a metal brush back, would disclose invention and an operative method of construction we are not called upon to decide; it is enough that the patentee did not so word the claim and it is beyond the province of the court to rewrite it. In Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344, Mr. Justice Bradley, at page 278 of 95 U. S., page 346 of 24 L. Ed., says: 'They (the patentees) cannot expect the courts to wade through the history of the art, and spell out what they might have claimed, but have not claimed. * * * But the courts have no right to enlarge a patent beyond the scope of its claim as allowed by the Patent Office. * * * As patents are procured ex parte, the public is not bound by them, but the patentees are. And the latter cannot show that their invention is broader than the terms of their claim, or, if broader, they must be held to have surrendered the surplus to the public.' See. also, cases cited in National Bunching Machine Co. v. Williams (C. C.) 44 Fed. 190, 194, 12 L. R. A. 107."

That the complainant is not entitled to any range of equivalents, see Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609, 617, 621, 27 Sup. Ct. 307, 51 L. Ed. 645; Cimiotti U. Co. v. American F. R. Co., 198 U. S. 399, 406, 410, 25 Sup. Ct. 697, 49 L. Ed. 1100; U. B. Co. v. Sonn, 154 Fed. 665, 83 C. C. A. 422.

There will be a decree dismissing the bill of complaint, with costs.